```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

DARNELL JAMES,                      )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        No. 4:07 CV 1382 HEA
                                    )                          DDN
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying in part the application of plaintiff Darnell James for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I.  BACKGROUND**

Plaintiff Darnell Jones was born on February 16, 1965. He is 5'8" tall, with a weight that has ranged from 190 pounds to 235 pounds. (Tr. 304-05, 454.) He completed high school and one year of college, and last worked doing light work at General Electric in 2001. (Tr. 507-08.)

On June 19, 2001, Jones filed an application for supplemental security income and disability insurance benefits, alleging he became disabled on May 1, 2001, as a result of back and neck pain. (Tr. 32-34, 71-77.) The application was initially denied on September 4, 2001. (Tr. 25-28.) After a hearing on June 6, 2002, the ALJ denied benefits on August 27, 2002. (Tr. 245-56, 301-24.) On January 22, 2003, the Appeals Council granted plaintiff's request for review, and remanded the case to another ALJ. (Tr. 266-68.) After a hearing on July 9, 2003, the ALJ denied benefits on February 19, 2004. (Tr. 13-22, 325-45.) On July 27,

2004, the Appeals Council denied plaintiff's request for review. (Tr. 5-8.)

On appeal to the district court, United States Magistrate Judge Thomas C. Mummert, III, found that the ALJ had based his decision on medical records and medical testimony that were not in the record. James v. Barnhart, 4:04 CV 1141 HEA/TCM (E.D. Mo. Aug. 30, 2005). Because these items were missing from the record, Judge Mummert recommended that the ALJ's decision be reversed and remanded, with instructions that the missing testimony and records be included in the record. Id. On September 14, 2005, United States District Judge Henry Edward Autrey adopted the recommendation, and ordered the case remanded to the Commissioner. (Tr. 398.) On November 25, 2005, the Appeals Council remanded the case to the ALJ, with instructions that the ALJ obtain, and enter into the record, the findings of reviewing physician Dr. Donnelly, and if possible, an MRI scan from August 1999 and a CT scan from January 2002. (Tr. 396-97.)

After a supplemental hearing on March 9, 2006, the ALJ denied benefits, for a third time, on October 26, 2006. (Tr. 354-61, 502-28.) On June 26, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 346-48.)

While James was appealing the denial of his initial application, he was struck by a car. The accident occurred on March 5, 2004. On January 20, 2005, James filed an application for disability benefits and supplemental security income. On November 21, 2005, the ALJ issued a fully favorable decision, finding James had become disabled on March 5, 2004. (Tr. 399-407.)

Only the onset date is now at issue, with the Commissioner finding an onset date of March 5, 2004, and James alleging an onset date of May 1, 2001.

## II. MEDICAL HISTORY[1]

On August 2, 1999, Dr. Kil Soo Lee, M.D., reviewed an MRI of the cervical spine. The MRI showed the disks of the spine were normal, and that the cervical spinal cord was normal in size, configuration, and signal intensity. Dr. Lee concluded the MRI presented a normal study. (Tr. 501.)

On February 9, 2004, Dr. Joseph Hanaway, M.D., wrote to Harry Nichols. Interpreting an MRI scan, Dr. Hanaway found James suffered from two herniated cervical disks at C3-4 and C4-5, and symptomatic protruding disks at L4-5 and L5-S1.[2] In his opinion, James could not perform any type of heavy work. (Tr. 296.)

On February 24, 2005, James saw Dr. Michael H. Bross, M.D., at the St. Louis County Department of Health, complaining of hives on his back and chest. James also complained of high blood pressure and depression. A physical examination revealed skin lesions on the chest and upper back, joint pain, and difficulty breathing with exertion, though his breathing sounds were normal. Dr. Bross prescribed medication for James's hives and high blood pressure. (Tr. 498-99.)

On July 1, 2005, James visited the Department of Neurology at Barnes-Jewish Hospital. The progress notes indicate that James suffered from chronic lower back pain, left hip pain, depression, post-traumatic stress disorder, and bladder urgency. He also reported intermittent numbness in his left foot and electric-like pain down his left leg. In March 2005, James received an epidural injection at L3-4 for his pain, but noted no benefit. There was a mild diffuse disk bulge at L3-4 with

---

[1] With the exception of the missing medical records and testimony, James's medical history up to August 27, 2003, is covered in Judge Mummert's Report and Recommendation.

[2] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

patent foramen, but no stenosis.[3]  James did note some pain relief since taking Elavil.[4]  (Tr. 488.)

On July 8, 2005, James saw Dr. Bross, complaining of rectal bleeding and joint pain.  The joint pain was persistent and mainly from the left hip and back.  James was walking with crutches and Dr. Bross thought he would be able to use a cane soon.  (Tr. 495-97.)

On July 13, 2005, James saw Dr. Ronald Gregush, M.D.  James had suffered a left acetabular fracture, a left crescent fracture, and sacroiliac joint injury after being hit by the car.[5]  He underwent surgery, but continued to have chronic pain, which was primarily neurologic in origin.  He had symptoms of significant sciatica and limited range of motion in his hips, a result of heterotopic ossification and osteoarthritis in the hip and sacroiliac joint.[6]  A physical examination revealed shooting pain down the left lower extremity with hip flexion and knee extension.  This pain was consistent with sciatica.  Dr. Gregush noted that since the accident had occurred over a year ago,

---

[3]Foramen is a perforation through a bone or a membranous structure. Stedman's Medical Dictionary, 605.  Patent means open or exposed. Id., 1149.  Stenosis is the narrowing or constriction of any canal. Id., 1473.

[4]Elavil is used to treat depression.  http://www.webmd.com/drugs. (Last visited July 17, 2008).

[5]The acetabulum is a cup-shaped depression on the external surface of the hip-bone, in which the head of the femur sits. Stedman's Medical Dictionary, 11.  A crescent fracture dislocation is a well-recognized subset of pelvic ring injuries, and is characterized by disruption of the sacroiliac joint. Journal of Bone and Joint Surgery, http://www.jbjs.org.uk/cgi/content/abstract/89-B/5/651 (Last visited July 17, 2008).  Sacroiliac relates to the sacrum and ilium bones.  The sacrum bone is the segment of the vertebra, which forms part of the pelvis.  The ilium bone is a broad, flaring portion of the hip bone. Stedman's Medical Dictionary, 1104, 1377.

[6]Sciatica is pain in the lower back and hip, radiating down the back of the thigh into the leg, usually due to herniated lumbar disk. Stedman's Medical Dictionary, 1391.  Heterotopic ossification is the abnormal formation of true bone within extraskeletal soft tissues. EMedicine, http://www.emedicine.com/radio/topic336.htm (Last visited July 17, 2008).

-4-

James's pain might not resolve. Dr. Gregush recommended continuing physical therapy. (Tr. 479-80.)

On July 20, 2005, James started seeing Dr. Georges Karam, M.D., at the Psychiatry Clinic. James noted getting better on his current regimen. He was sleeping better and not waking up as frequently. He reported bad mood swings and decreased energy. (Tr. 474.)

On August 31, 2005, James saw Dr. Karam. James noted feeling depressed, frustrated, having decreased energy, and poor concentration. At the time, James was taking Ambien, Amitriptyline, Cyclobenzaprine, Enalapil, Hydrochlorothiazide, Ibuprofen, Norvasc, Zoloft, and Ferrous Sulfate.[7] (Tr. 470-71.)

On September 30, 2005, James saw Dr. Shirley A. Marshall, M.D., at the St. Louis County Department of Health. He was still having a lot of pain, which interrupted his sleep. A physical examination showed back pain and swelling in the extremities. James was walking with crutches and had numbness in the lower extremity. He had stopped attending physical therapy because of the pain. (Tr. 493-94.)

On October 7, 2005, James saw Dr. Karam. He was sleeping better, but still waking up frequently because of the pain. Dr. Karam diagnosed James with major depressive disorder. He also noted that James suffered from a bladder rupture, hip and pelvic fractures from the accident, hypertension, and chronic neck and back pain. (Tr. 466-67.)

On October 21, 2005, James visited the Department of Neurology at Barnes-Jewish Hospital. The progress note indicates James was still complaining of left leg pain, left hip pain, and persistent lumbar back pain. He also complained of electric-like pain that shot down his left side. James frequently changed positions and could not sit for longer than thirty minutes at a time. He noted interrupted sleep. He had been released from physical therapy. He had an antalgic gait, but his neck

---

[7]Ambien is used to treat insomnia. Amitriptyline and Zoloft are used to treat depression. Cyclobenzaprine is a muscle relaxant used to treat muscle pain and spasms. Enalapril, Hydrochlorothiazide, and Norvasc are used to treat high blood pressure. Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling. Ferrous Sulfate is an iron supplement, used to treat low iron levels in the blood. http://www.webmd.com/drugs. (Last visited July 17, 2008).

muscles were strong, he was alert and oriented, and was pleasant and comfortable.[8] The doctors diagnosed him with chronic back and hip pain, and left sciatica. The doctors started him on Methadone, Ibuprofen, and Darvocet, and continued his Elavil prescription.[9] (Tr. 461-63.)

On November 16, 2005, James saw Dr. Karam. He noted sleeping better, but was still waking up frequently because of the pain. He noted increased pain following the accident, and had been seeing a new pain specialist for better pain management. (Tr. 454-55.)

On November 23, 2005, James saw Dr. Gary Fetzer, M.D., complaining of knee pain. A physical examination found mild effusion in his right knee, but that his knee was stable to stress and there was no fracture or dislocation.[10] There was no lateral joint line tenderness and his neurovascular examination was within normal limits. Dr. Fetzer diagnosed James with chronic neuropathic pain in his left lower extremity and an insidious new onset of right knee pain. Dr. Fetzer recommended a non-steroidal anti-inflammatory, and that James ice his knee. He was walking with crutches and also had a cane and walker. James was doing exercises twice a day, but there was no change in his range of motion. X-rays showed fractures of the left ilium and left acetabulum (from the car accident) had healed, there was a small right knee effusion, bilateral hip osteoarthritis, and unchanged heterotopic ossification within the pelvis. (Tr. 440-51.)

On December 16, 2005, James saw Dr. Marshall. James noted experiencing right knee pain and relying on crutches to walk. A physical examination showed mild swelling in the right knee, but no joint line tenderness and no swelling in the ankle. The right knee appeared mildly larger than the left. (Tr. 491-92.)

---

[8]An antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain. See Stedman's Medical Dictionary, 65, 91.

[9]Darvocet is a drug with a narcotic component and is used to treat mild to moderate pain. Methadone is also a drug with a narcotic component and is used to treat moderate to severe pain. http://www.webmd.com/drugs. (Last visited July 17, 2008).

[10]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

On January 20, 2006, James saw Dr. Karam. A progress note indicated James was having a better year, had lost weight, and was not suffering from depression anymore, though noted "depressive moments." Physically, he was doing a little better. (Tr. 436-37.)

On February 10, 2006, James visited the Neurology and Nuerosurgery Clinics at Barnes-Jewish Hospital, complaining of right knee pain. The treatment notes indicated he was tolerating methadone, but was still having problems with pain. He had a slight hyper-extension in his right knee when he walked, and an antalgic gait. There were no new neurological symptoms. He was diagnosed with chronic back pain, sciatica, and right knee pain. The doctors recommended physical therapy for his right knee and possibly the use of a brace. (Tr. 430-33.)

On July 20, 2006, James provided a list of his prescription medication. He noted taking Norvasc, Hydrochlorthiazide, Enalapril, Cyclobenzaprine, Wellbutrin for depression, Amitriptyline, Ambien, and Ferrour Sulfate. (Tr. 428.)

**Testimony at the Hearings**

At the hearing on March 9, 2006, James testified about his prior work history. He last worked in 2001, at General Electric, doing light duty work - packing books or operating an ink machine. James worked at General Electric for a few months, before being fired for being unable to sit or stand for long periods of time. Before General Electric, James might have worked at a supply warehouse, but could not remember exactly. From January to September 1999, James worked for Herman Oak Leather. He worked there full time, as a trimmer, a thrower, and a clean-up person. As a trimmer, James had to stand and lift close to 600 cow hides a day, each weighing about 100 pounds. As a thrower, James had to stand and kneel, and also lift about 100 pounds. As a cleaner, James had to lift up to 85 pounds. Before working at Herman Oak Leather, James did a number of odd jobs, working with drill presses, performing machine operating jobs, and then working casual jobs, like at the post office. The machine operating jobs required a combination of sitting and standing, and also required a bit of bending and lifting. Some of the

-7-

machine operating jobs required lifting only a few pounds, while others required lifting weights of 30 to 40 pounds. (Tr. 502-11.)

From May 2001 to March 2004, James said his most significant problems were with his neck and back, a result of all the lifting and turning at Herman Oak Leather. Turning his neck caused problems. He also experienced a shocking sensation that ran from the middle of his neck through the shoulders. James said the neck pain came "every day, every hour on the hour, every minute on the minute." At times, James said the pain was 10 out of 10. Medication, like Ibuprofen or Advil, provided relief for no more than twenty minutes. James said his back pain was equally bad, and that the medications were equally ineffective. Beyond his neck and back pain, James did not have any other problems during the period in question. (Tr. 512-17.)

On July 20, 2006, the ALJ held a supplemental hearing to give James the opportunity to present additional evidence. At the hearing, James described being hit by a van involved in a police chase, in March 2004. As a result of the accident, James suffered a fractured left hip, a broken pelvis, and had a stomach and bladder injury. He needed three surgeries to repair the injuries to his bladder, hip, and pelvis. After the accident, James was in a wheelchair for six or seven months, before moving to a walker, and then to crutches. James had gone to pain management to learn how to walk with all the plates and screws in his hip. He did not think the pain management was very successful. James received pain injections for his back, but nowhere else. For about a year, James had been taking Methadone and Amitriptyline for his pain. James did not have surgery on his neck or lower back. (Tr. 518-28.)

### III. DECISION OF THE ALJ

The ALJ found James suffered from discogenic and degenerative disorders of the back, and that he had history of spinal strains. The ALJ found these impairments were severe, and that they limited James's ability to perform basic work activities. Nonetheless, the ALJ concluded that James retained the residual functional capacity (RFC) to lift, carry, push, and pull twenty pounds occasionally and ten pounds

frequently, and to sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 356-59.)

In making this determination, the ALJ found that James's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. The ALJ expressly adopted the credibility findings made by the previous ALJ on February 19, 2004. (Tr. 359-60.) In that opinion, the ALJ noted several incidents that detracted from James's credibility. James had infrequently visited his physicians for treatment. He also had not taken prescription medication for long periods, and did not seek financial assistance to cover the costs of the drugs when he could not afford them. James noted that the pain interfered with his sleep, yet testified that he napped three times a day. He noted difficulty turning his neck, but performed daily cervical exercises, was able to cradle a phone between his ear and shoulder, and was seen making a quick and smooth look to the left while crossing the street outside the therapist's office. Finally, James was able to perform a number of daily activities - walking six blocks to the grocery store, washing dishes, cleaning his room, and cleaning the stove. The ALJ therefore found James's allegations were not credible. (Tr. 388.)

The ALJ also noted that the missing medical records did not support James's claims. The MRI report from August 1999 showed he had a normal study of the cervical spine. The CT scan from January 2002 was not included in the new record, but no credible evidence showed the CT scan had produced significantly abnormal results.[11] (Tr. 359-60.)

Having discussed the MRI report and the CT scan, the ALJ adopted the findings by the previous ALJ. In particular, the ALJ noted that there were conflicting opinions concerning James's ability to work, but that the weight of the evidence showed James had no limitations which would prevent him from working. Indeed, four of the five physicians, who had offered opinions, believed James had either no limitations or only slight limitations. Dr. Hanaway, the only physician who believed James could not perform regular work activity, had endorsed a contrary position in

---

[11]The missing medical report by Dr. Donnelly is still not included in the record, but the ALJ did not rely on this report in determining James's RFC.

two earlier examinations.  In October 2000, Dr. Hanaway found James had no neurological deficits, full range of motion of his cervical and lumbar spine, no spasms or positive trigger points, and normal strength, reflexes, muscle tone, and coordination.  In January 2003, Dr. Hanaway found James had some limited range of motion of the spine, but no signs of radiculopathy, and no other noteworthy deficits.  Looking to the Dictionary of Occupational Titles, the ALJ concluded that James was capable of performing his past relevant work as a hand trimmer.  James was therefore not disabled within the meaning of the Social Security Act. (Tr. 360-61.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A).  A five-step regulatory framework governs the evaluation of disability in general.  See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision

is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In this case, the Commissioner determined that James could perform his past work from May 1, 2001, to March 5, 2004.

## V. DISCUSSION

James argues the ALJ's decision is not supported by substantial evidence. First, James argues the ALJ erred by failing to properly evaluate his RFC under Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000)(regarding the weight to be given to a consulting physician), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001)(regarding substantial evidence supporting a residual functional capacity finding). In particular, James argues the ALJ failed to articulate sufficient reasons for discounting the opinion of Dr. Hanaway, failed to fully develop the record with respect to Dr. Hanaway's medical opinion, and failed to recontact Dr. Hanaway. Second, James argues the ALJ erred by failing to conduct a function-by-function analysis of his ability to perform his past work, as required by Pfitzner. In particular, James argues the ALJ failed to make any explicit findings concerning the mental demands of his past relevant work.

**Residual Functional Capacity (RFC)**

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d at 704.

In this case, the ALJ found James's allegations not entirely credible, and determined he was capable of performing his past relevant work. Substantial medical evidence supports these findings.

In March 1999, James fell off a roof, but his back, neck, and abdomen were fine. He was released to return to work without restrictions. (Tr. 157-58.) In June 1999, an x-ray of his spine and shoulder was negative. (Tr. 151.) James noted no pain in his neck, hands, or legs, and full range of motion in his cervical spine and left elbow. (Tr. 148-49.) He could return to work, but was to limit his lifting to twenty pounds. (Tr. 140.) In July 1999, Dr. Mirkin found James had full range of motion in his cervical spine, shoulders, elbows, and wrists. X-rays of his cervical spine and left shoulder were normal. Dr. Mirkin believed James's subjective symptoms were out of proportion with the objective findings, and released James to return to work with a restriction against lifting more than thirty-five pounds. (Tr. 205-06.)

In August 1999, Dr. Soo Lee reviewed an MRI of James's cervical spine. The MRI showed the disks of the spine were normal. (Tr. 501.) That same month, Dr. Mirkin also found the MRI normal. (Tr. 198.) He noted James's deep tendon reflexes, motor exams, and sensory exams were all intact. Dr. Mirkin said he could find nothing wrong with James. Finally, Dr. Mirkin observed James exaggerating his symptoms. (Tr. 196.) Dr. Hogan also found nothing wrong with James and believed he could return to work without restrictions. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). (Tr. 194.)

In October 2000, Dr. Hanaway found James had no spasms in his neck and a full range of motion in his neck, from side to side, and on flexion and extension. His motor function, muscle bulk, tone, and strength in his upper and lower extremities were all normal. His lower back was straight, with no spasms, and he had full range of motion forward and to the side. Dr. Hanaway noted very few physical findings. (Tr. 226-27.)

In April 2001, Dr. Peeples found James had full range of movement in his cervical and thoracic spine, and could easily bend over to ninety

degrees in his lumbar spine.  Bulk, tone, and power were normal and symmetric in his upper and lower extremities.  Coordination, gait, and station were also normal.  (Tr. 211.)  In May 2001, James denied any musco-skeletal or neurological problems, sleep disorders, back pain, or chest pain.  He also denied any decreased function in his neck, lower back, hips, knees, legs, ankles, or feet.  (Tr. 217.)

In April 2002, Dr. Hanaway reviewed a CT scan from January 2002.  Although a report said the CT scan was normal, Dr. Hanaway thought the results of the CT scan were not normal.  (Tr. 228.)  James did not see Dr. Hanaway again until January 2003.  James, 4:04 CV 1141 HEA/TCM at 13; see Bostic v. Astrue, 1:06 CV 140 CAS, 2008 WL 697589, at *12 (E.D. Mo. March 13, 2008) (noting that the failure to seek regular medical treatment disfavors a finding of disability).

The ALJ determined that James retained the RFC to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently, and to sit, stand, or walk for about six hours in an eight-hour workday.  (Tr. 356-59.)  After reviewing the record, substantial medical evidence supports the ALJ's RFC determination.

**Weighing Medical Testimony**

James argues the ALJ failed to articulate sufficient reasons for discounting the opinion of Dr. Hanaway.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.  Pearsall, 274 F.3d at 1219. 2001).  The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.  Id.  Normally, the opinion of the treating physician is entitled to substantial weight.  Casey, 503 F.3d at 691.  The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  Singh v. Apfel, 222 F.3d at 452.

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data.  Casey, 503 F.3d at 691.  The ALJ may credit other medical evaluations over the opinion of a treating

physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

In this case, the ALJ discounted the opinion of Dr. Hanaway. In doing so, the ALJ noted that Dr. Hanaway had endorsed inconsistent positions. In October 2000, Dr. Hanaway found James had no neurological deficits, had full range of motion of his cervical and lumbar spine, had no spasms or positive trigger points, and had normal strength, reflexes, muscle tone, and coordination. (Tr. 226-27.) In January 2003, Dr. Hanaway found James had some limited range of motion of the spine, but no signs of radiculopathy, and no other noteworthy deficits. Dr. Hanaway concluded James could not perform any heavy duty work, but said nothing about James's ability to perform lighter work. (Tr. 287.) In February 2004, Dr. Hanaway again concluded that James could not perform the heavy lifting requirements of his job at Herman Oak Leather or any other kind of heavy job, but did not make any detailed finding about James's ability to perform lighter work. Nonetheless, Dr. Hanaway pronounced James "permanently disabled." (Tr. 296.)

Dr. Hanaway's opinions are not consistent and there is no detailed support for his conclusion that James was permanently disabled in February 2004. In addition, the opinions of Dr. Hanaway run against the opinions of four other physicians. One of these physicians, Dr. Mirkin, had treated James on several different occasions, and had personally observed him exaggerating his symptoms. In his opinion, the ALJ noted the internal inconsistencies in Dr. Hanaway's opinions and the contrary medical testimony of other doctors. Accordingly, the ALJ articulated a sufficient reason for discounting the opinions of Dr. Hanaway. See Guilliams, 393 F.3d at 803; Cantrell, 231 F.3d at 1107.

**Recontacting Dr. Hanaway**

James argues the ALJ should have recontacted Dr. Hanaway if he found ambiguities in his opinions.

The Social Security regulations do not require an ALJ to recontact a treating physician whose opinion was contradictory or unreliable. Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006) (citing 20 C.F.R. § 404.1512(e)). The duty to recontact a medical source is triggered when the evidence is insufficient to make an informed determination -- not when the evidence is insufficient to make a favorable determination. Pearson v. Barnhart, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005). Under the regulations, "[t]he ALJ is required to recontact medical sources . . . only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

In this case, the available evidence in the record provides an adequate basis for determining the merits of the disability claim. As noted above, substantial medical evidence supports the ALJ's RFC determination and the conclusion that James was not disabled during the relevant period in question. Despite the internal inconsistencies, the ALJ did not err by failing to recontact Dr. Hanaway. See id. (Where the ALJ finds a physician's opinion inconsistent with other substantial evidence, the "ALJ may discount [that] opinion without seeking clarification.").

**Develop the Record**

James argues the ALJ failed to fully develop the record with respect to Dr. Hanaway's medical opinions.

A social security hearing is a non-adversarial proceeding, which requires the ALJ to fully and fairly develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). And while the duty to fully develop the record may include the obligation to recontact a treating

physician for clarification of an opinion, "that duty arises only if a crucial issue is undeveloped." Id.

As noted above, the ALJ had no duty to recontact Dr. Hanaway. In addition, James does not argue that the record is missing any relevant medical records. Indeed, the record before the court is over 500 pages long, includes the opinions of four different ALJs, and includes the transcripts of four hearings. The ALJ fully and fairly developed the record.

**Return to Past Work**

James argues the ALJ erred by failing to conduct a function-by-function analysis of his ability to perform his past work. In particular, James argues the ALJ failed to make any explicit findings concerning the mental demands of his past relevant work.

The ALJ determines a claimant's ability to perform past work by comparing the claimant's RFC to the physical and mental demands of the claimant's past work. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994). In making this comparison, the ALJ must detail the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's RFC. Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991). Taken together, "an ALJ has an obligation to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [himself] is capable of doing" before determining the claimant can perform his past relevant work. Id. at 1238. A conclusory statement that the claimant can perform past work, without any explicit findings, does not constitute substantial evidence and will require remand. Id. at 1239.

In investigating the demands of a claimant's past work, the ALJ may rely on the claimant's description of his actual job, or may look to how the job is performed in the national economy. Stephens v. Shalala, 50 F.3d 538, 542 (8th Cir. 1995); Brinegar v. Barnhart, 358 F. Supp. 2d 847, 858 (E.D. Mo. 2005). "Where the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be

disabled." Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000).  The
Dictionary of Occupational Titles (DOT) describes the demands of a job
as it is usually performed in the national economy.  See Kirby v.
Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991).  The ALJ satisfies the
duty to make explicit findings by expressly referring to the DOT's
specific job description of the claimant's past work.  Pfitzner v. Apfel,
169 F.3d 566, 569 (8th Cir. 1999).  The ALJ may also rely on vocational
expert testimony to fulfill this obligation.  Ramirez v. Astrue, No. 06-
5126-CV-SW-W-SSA, 2008 WL 880167, at *3 (W.D. Mo. March 28, 2008).

In this case, the ALJ determined that James retained the RFC to
lift, carry, push, and pull twenty pounds occasionally and ten pounds
frequently, and to sit, stand, or walk for about six hours in an eight-
hour workday.  The ALJ then expressly stated that he was comparing this
RFC to the mental and physical demands of James's past work as a hand
trimmer.  In making this comparison, the ALJ included a direct citation
to the relevant entry of the Dictionary of Occupational Titles.  (Tr.
360) (citing U.S. Dep't of Labor, Dictionary of Occupational Titles
§ 585.684-010 (4th ed. 1991), available at 1991 WL 684386).  Looking to
the DOT, the job of hand trimmer requires light work, which means the
ability to exert up to twenty pounds of force occasionally and ten pounds
of force frequently, and a significant amount of walking.  Dictionary of
Occupational Titles, § 585.684-010.  The requirements for working as a
hand trimmer are compatible with James's RFC.  In addition, the ALJ
satisfied the demands of Pfitzner by including a direct reference to the
DOT's job description of a hand trimmer.

The ALJ did not make any explicit findings about the mental demands
of James's past work.  However, James never alleged that he was disabled
as a result of any mental impairment.  In his applications for benefits,
James alleged he was disabled because of his neck and back injuries.
(Tr. 32-34, 71-77.)  At the hearing, the ALJ asked James which problems
interfered with his ability to work.  James responded that the problems
were with his neck and back.  (Tr. 512-13.)

An ALJ has no duty to investigate or consider a claim that is not
presented at the time of the application for benefits and that is not
offered at the hearing as a basis for disability.  Smith v. Astrue, 232

-17-

F. App'x 617, 619 (8th Cir. 2007). Since James never alleged any mental impairments, it follows that the ALJ had no obligation to make specific findings about the mental demands of James's past work. See Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999) (Where the ALJ had already determined that mental limitations did not significantly affect the claimant's ability to work, the ALJ did not err by failing to make specific findings regarding the mental demands of claimant's past work).

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

                                                            /S/ David D. Noce
                                           **UNITED STATES MAGISTRATE JUDGE**

Signed on August 18, 2008.